(Nos. 53550, 53561 cons.—

THE NORTHERN TRUST COMPANY, Trustee, Appellant, v. SYLVIA TARRE *et al.* (Sylvia Tarre *et al.*, Appellants; Leonard Kaplan *et al.*, Appellees).

*Opinion filed September 30, 1981.—Rehearing denied November 25, 1981.*

Barnard & Barnard, of Chicago (Morton John Barnard, of counsel), for appellant Northern Trust Co.

Daniel M. Schuyler and Edgar D. Ballard, Jr., of

Schuyler, Ballard & Cowen, of Chicago, for appellants Sylvia Tarre *et al.*

John F. McCarthy, Esther R. Rothstein, and Robert Lee Shapiro, of Chicago (McCarthy and Levin, of counsel), for appellees Leonard Kaplan *et al.*

Edward T. Joyce and Steven J. Rotunno, of Chicago (Edward T. Joyce, Ltd., of counsel), for appellee Joseph Tarre.

MR. JUSTICE RYAN delivered the opinion of the court:

The Northern Trust Company filed suit in the circuit court of Cook County seeking instructions as to the proper distribution of assets held on behalf of Harry and Fannie Kaplan, deceased settlors under a trust agreement executed by them and naming Northern as trustee. Joined as defendants were Leonard Kaplan and Sylvia Tarre (the settlors' children); Raymond Kaplan and Linda Kaplan Beatus (son and daughter of Leonard); Mark Tarre and Laurel Tarre Goodman (son and daughter of Sylvia); and Joseph Tarre (the minor son of Mark Tarre), all beneficiaries under the trust. The controversy centered around the validity of an amendment executed by Harry Kaplan following the death of his wife. The trial court found the amendment to be a valid exercise of the powers reserved by the settlors. However, the appellate court held that the trust agreement was executed pursuant to a contract between the settlors, and that Harry's amendment was executed in violation of this contract and was consequently invalid. (83 Ill. App. 3d 684, 691.) The judgment of the trial court was reversed and the cause remanded with directions. The Northern Trust Company as well as the Tarre defendants petitioned this court for leave to appeal. We granted both petitions and consolidated the cases in this court.

On August 26, 1969, Harry and Fannie Kaplan entered into a trust agreement whereby the settlors transferred various property to Northern under the terms and provisions of a document entitled "Trust Agreement, Trust No. 35458." The trust agreement is quite comprehensive (34 pages) and is broken down into 10 separate "articles," each containing several numbered paragraphs. Articles I and II of the document are designated "Trust A" and "Trust B," respectively. The preamble to the agreement states that Harry is conveying his interest in certain specified property into Trust A, while Fannie is conveying her interest in certain property into Trust B. Substantially identical provisions in articles I and II describe how the property in the respective trusts is to be managed, how the income is to be distributed to the respective settlors during their lifetimes, and the power of the trustee to invade the principal for limited purposes. Both articles contain payout provisions directing disbursement of one-half of the value of the respective trust assets (after certain deductions) upon the death of the settlor. The payment is to be made to the surviving settlor's trust, but only if that settlor survives the death of the other by 180 days. In no event is the payout to diminish the trust of the decedent to a value of less than $75,000. Both articles also provide that the income generated by the residue in the deceased settlor's trust is to be paid to the survivor for life.

Article III sets out the distribution scheme to be employed upon the death of the surviving settlor. It directs that after payment of certain expenses outlined in both article I and article II, as well as a specific devise of $5,000 from Trust B to Fannie's nephew, the trustee shall commingle the assets of the two trusts and make a distribution. The thrust of article III's distribution plan is that, if Sylvia is then alive, $100,000 of the commingled Trusts A and B is to be held in "Trust C" for her benefit as provided in article IV. The residue of the commingled trusts is then to be split with

one-half going to Leonard and the other half (or the entire residue if Leonard is not alive) divided among the settlors' grandchildren, Raymond and Linda Kaplan, and Mark and Laurel Tarre, with alternate distribution provisions operating in the event of a deceased grandchild. Article III also describes alternative gifts which are to take effect if Sylvia does not survive the settlors as well as a gift of $5,000 to the Northwest Home for the Aged.

Article IV is designated "Trust C" and sets out the income and distribution scheme to be employed with respect to Trust C assets. Articles V through X contain various provisions regarding alternative distributions, the rights and duties of the trustee, as well as other general administrative matters not immediately relevant to this appeal. The agreement is signed by both settlors and a representative of Northern Trust Company. Appended to the trust agreement and bearing the title "Trust No. 36468" are two documents listing the property transferred by each settlor. The two schedules are identical in every respect except for the name of the transferor.

Paragraph 1.5 of article I (Harry's trust—Trust A) and paragraph 2.5 of article II (Fannie's trust—Trust B) contain identical provisions reserving certain powers to the settlors of Trust A and B, respectively. Those paragraphs provide:

"By written instrument executed by Harry [Fannie] and delivered to the trustee during his [her] lifetime, Harry [Fannie] may at any time and from time to time (a) withdraw or dispose of such portions of the principal or any asset of Trust A [B] as he [she] may direct; (b) direct the trustee as to the purchase, sale, mortgage, pledge or other disposition of assets of Trust A [B], irrespective of the risk involved, but the sole responsibility for and risk of any such action in accordance with any such direction shall be Harry's [Fannie's], and neither the trustee nor any successor trustee shall be liable or responsible or assume any risk whatsoever for any action taken or omitted in accord-

ance with any such direction; or (c) *revoke or amend this agreement as to Trust A* [B], but no amendment affecting or limiting the trustee's powers, duties or discretions shall be made without its consent." (Emphasis added.)

Fannie died on April 12, 1976, not having exercised her power to amend the agreement during her lifetime. At the time of her death, the net value of Trust B was $110,868.87. Pursuant to the trust agreement, $75,000 was held in her Trust B and the excess paid over to Trust A. On May 26, 1976, Harry executed an amendment to Trust A in which he continued the gift of $5,000 to the Northwest Home for the Aged, which had been provided for in article III of the original trust agreement. However, he deleted certain provisions of the agreement noted below and provided that the remaining Trust A assets, upon Harry's death, be held in Trust A and be administered for the benefit of Sylvia and, at her death, be distributed to her children.

The document executed by Harry is entitled "AMENDMENT TO THE HARRY M. KAPLAN TRUST A, TRUST NO. 36468" and contains 10 numbered paragraphs, the first 5 of which alter specific provisions of article I to provide the gifts described above. Paragraph 6 of the amendment states, "ARTICLES III, IV and V are deleted from this Trust A." Paragraphs 7, 8 and 9 of the amendment modify articles VI and VII of the original agreement and adopt the Trusts and Trustees Act (Ill. Rev. Stat. 1975, ch. 148, par. 101 *et seq.*) as applicable to Trust A. Paragraph 10 states that, in all other respects, articles VI through X remain unchanged.

The obvious purpose of the amendment is to extend the life of Trust A beyond Harry's death, thereby escaping the commingling and distribution provisions of article III of the original agreement. This amendment, if valid, would adversely affect the amount of the distribution to which Leonard and the Kaplan grandchildren would be entitled under the original agreement.

At the time of Harry's death, the gross value of his trust (Trust A) was $164,744.60. Of this amount, $30,868.67 had been received from Fannie's Trust B following her death. After Harry's death, pursuant to the trust agreement, Northern paid out $14,200.90 in expenses, claims and the distribution to Northwest Home for the Aged. The balance remaining in Harry's Trust A is $150,543.70. Had the trust agreement not been amended, this amount and the $75,000 remaining in Fannie's Trust B would have been commingled pursuant to article III of the original agreement, and would have totaled $225,543.70. Of this amount, $100,000 would have been transferred to Trust C for Sylvia (settlors' daughter) and $5,000 would have been distributed under article III to the Northwest Home for the Aged. The balance of $120,543.70 would have been distributed one-half to Leonard (settlors' son), and the other one-half would have been divided equally and distributed to the four grandchildren of the settlors (two grandchildren are the children of Leonard and two are the children of Sylvia).

In response to Northern's complaint for construction of the trust agreement, the Kaplan defendants (Leonard and his children) did not contest the validity of the amendment, but requested that the $75,000 remaining in Trust B be distributed one-half to Leonard and one-eighth to each of the four grandchildren. Later, the Kaplan defendants filed an amended answer in which it was alleged that the original agreement was a joint and mutual agreement between Harry and Fannie and since Harry had received the benefits of the agreement following Fannie's death, he could not amend his trust. It was alleged that the amendment was therefore of no effect. The amended answer filed by the Kaplan defendants, in the alternative, alleged that the $75,000 should be distributed to Leonard and his children. As a second alternative the amended answer prays that the $75,000 be distributed as intestate property.

The trial court held the amendment valid. The

$150,543.70 balance in Harry's Trust A was therefore directed to be held for the benefit of Sylvia. The court directed the trustee to pay from the $75,000 remaining in Trust B the attorney fees for the parties and directed that the balance be held under Trust C as provided in article IV of the original agreement. Sylvia, under that article, is the beneficiary of Trust C.

In the appellate court, the Tarre defendants (Sylvia and her children) objected to the award of attorney fees to the Kaplan defendants. The Kaplan defendants, in turn, contended that the attorney fees should not have been payable solely from the $75,000 in Trust B. The appellate court held it was proper to allow attorney fees to the Kaplan defendants. No issue concerning attorney fees has been raised in this court.

The appellate court found that the evidence established a contract between Harry and Fannie to dispose of their property according to a common plan. In reaching that conclusion, the court looked to the law concerning joint and mutual wills (see *Helms v. Darmstatter* (1966), 34 Ill. 2d 295, 300-01) and held that the mutual agreement or contract was enforceable. This result required the commingling of Trust A and Trust B and the disposition of the commingled funds as directed in article III of the original agreement. The result of this holding was to render the amendment of Harry's Trust A inoperative. The appellate court acknowledged that there were apparently no Illinois cases applying the joint and mutual will contract concept to trusts. In reaching its conclusion, it relied heavily, however, on a Kansas case, *Reznik v. McKee* (1975), 216 Kan. 659, 534 P.2d 243, which applied this principle of law to trusts. The appellate court also did not think that the reservation by the settlors of the power to amend or revoke their respective trusts manifested an intent that the original agreement should not constitute a binding contract to dispose of the property according to the common plan set forth therein.

By discussing *Reznik* we express no opinion as to whether, under proper circumstances, the law relating to joint and mutual wills is applicable to trusts. That decision must await another day and a proper case. We simply hold that that law is not applicable under the facts of this case. These facts differ substantially from those present in *Reznik*, which led the Supreme Court of Kansas to hold that two separate trust agreements, executed by the husband and wife individually, could not be amended or revoked by the survivor of them. In *Reznik*, each trust agreement specifically stated that certain heirs were being omitted from its distribution scheme because of provisions made by the other spouse. The husband's trust stated:

"Settlor makes no provision for distributions for the primary benefit of Settlor's children for the reason that he has previously made provision for them by gifts of stock and otherwise, and *also for the reason that Settlor's wife has made ample provision for such children.*" (Emphasis in *Reznik*.) (*Reznik v. McKee* (1975), 216 Kan. 659, 663, 534 P.2d 243, 248.)

A similar provision in the wife's trust recited:

"Settlor make[s] no provision for the distributions for the primary benefit of Settlor's grandchildren *for the reason that Settlor's husband has made ample provision for such grandchildren.*" (Emphasis in *Reznik*.) (*Reznik v. McKee* (1975), 216 Kan. 659, 663, 534 P.2d 243, 248.)

In addition, the preamble to each trust document stated that the settlor was "joined" in the execution by the spouse, who in both cases, consented to and "executed" the agreement. These and other factors indicative of the settlor's true intentions, the court held, rendered the survivor's trust irrevocable and not subject to modification notwithstanding an express reservation in each document of the power "to alter, amend or revoke." The Kansas court concluded that the husband had executed his trust pursuant to a contract with his wife and that his attempt to alter its

provision after her death gave rise to a claim against his estate. *Reznik v. McKee* (1975), 216 Kan. 659, 673, 534 P.2d 243, 255.

Although the original agreement in this case constituted a comprehensive estate plan, there is nothing in that agreement which expressly or impliedly creates a contractual arrangement beween Harry and Fannie that the disposition may not be altered. Unlike *Reznik,* in our case the other provisions of the trust agreement do not conflict with the power reserved to revoke or amend. We recognize that where the language of an agreement is ambiguous a court may look beyond the document to ascertain the sense in which the parties used particular terms. (*Continental Illinois National Bank & Trust Co. v. Art Institute* (1951), 409 Ill. 481, 489; *Olson v. Rossetter* (1948), 399 Ill. 232, 241.) The rules of construction which apply to the interpretation of contracts apply to the construction of trust instruments as well. The object of judicial construction in this regard is to determine the intent of the parties and to carry it out, but it is not the function of a court to modify the document or create new terms different from those to which the parties have agreed. *American Rubber & Plastic Corp. v. First National Bank* (1971), 50 Ill. 2d 172, 174; *United States Trust Co. v. Jones* (1953), 414 Ill. 265, 270; *Olson v. Rossetter* (1948), 399 Ill. 232, 238.

In order to find a "contract" not to alter the provisions for the disposition in the trust agreement, it would be necessary to read into that agreement conditions it does not contain, and which are contrary to the express language of the instrument and its clear intent. The original instrument reserved to both settlors the power to "revoke or amend this agreement as to" their respective trusts. Nothing in the agreement limits the exercise of this power or indicates that the power may be exercised only during the time that both settlors are living. Also, the agreement does not require the consent of one settlor to the exercise of the power by the

other. The reservation of the power is unrestricted. We must conclude that the reservation of this unrestricted power was agreed to by both the settlors, since the provisions were included in the executed trust agreement and both settlors reserved these powers. We cannot view these provisions as mere "boiler plate" language as the Kaplan defendants imply. Rather, the reservation of the power to revoke or amend appears to be an essential part of an estate plan designed to take maximum advantage of the marital deduction provisions for Federal estate tax purposes. The provisions of the agreement concerning the transfer of assets from one trust to another upon the death of a settlor make several references to the adjusted gross estate as finally determined for Federal estate tax purposes and the marital deduction with reference to the Federal estate tax.

This carefully drafted plan, to qualify for the Federal estate tax marital deduction, would not achieve its intended purpose if the agreement were to prohibit the survivor from revoking or amending the trust after the death of the other settlor. In cases involving joint wills or mutual wills, which were held to be irrevocable because of an agreement between the husband and wife, the effect of such an agreement has been held to deny the estate the benefit of the marital deduction. (See *Estate of Opal v. Commissioner* (2d Cir. 1971), 450 F.2d 1085; *Batterton v. United States* (5th Cir. 1968), 406 F.2d 247.) By way of contrast to these cases, in *Dekker v. United States* (S.D. Ill. 1965), 245 F. Supp. 255, the husband and wife had executed a joint will giving all the property to the survivor and anything that was left upon the death of the survivor was to go to their children. The court held that the will did not indicate an intent to create a contractual disposition of the property and that the survivor had an absolute interest under the will. By virtue of the absence of a binding contractual disposition, the court held that the estate qualified for the marital deduction. We conclude that the original trust agreement did not constitute

a contractual arrangement between the settlors which would restrict the right of the survivor in the exercise of the reserved power to revoke or amend the agreement as to his trust. Harry's amendment providing for the continuation of Trust A for the benefit of Sylvia is therefore valid and enforceable.

We also do not agree with the alternate contention of the Kaplan defendants as to the disposition of the $75,000 remaining in Trust B. In the amended answer the Kaplan defendants alleged that in the event Harry's amended Trust A is valid, the $75,000 remaining in Trust B should be distributed to Leonard and his children. In this court, however, they argue that $75,000 should be distributed to Leonard and the four grandchildren, including two of Sylvia's children. This is the provision which is contained in the original agreement for the distribution of the commingled assets of Trust A and Trust B remaining after the payment of certain expenses and after setting over $100,000 for Trust C for Sylvia. To accomplish this result the Kaplan defendants urge this court to eliminate Trust C from the trust agreement entirely. We have held that Harry could validly amend Trust A, removing its property from the operation of article III. This then leaves as the only trust assets subject to the provisions of article III the $75,000 remaining in Trust B. Under the provisions of the original agreement, this amount is to be transferred to Trust C. We conclude that the disposition ordered by the trial court of the $75,000 remaining in Trust B is the correct disposition to be made of that property.

Article III of the original agreement does not become inoperative simply because Harry has removed the assets of Trust A from its operation. This is the basis for our holding on the last contention above. It is also the reason we hold that the $75,000 should not pass as intestate property, which is an alternate contention of the Kaplan defendants. The

trust agreement specifically provides for the distribution of the assets remaining in Trust B. There is no reason to declare that they should pass as intestate property.

For the reasons herein stated, the judgment of the appellate court is reversed and the judgment of the circuit court of Cook County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*